O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| WEST COAST CORVETTES, INC., a California corporation,<br><br>      Plaintiff,<br><br>  vs.<br><br>MV MARKETING, INC., d/b/a CORVETTE MIKE et al.<br><br>      Defendants. | Case No.: SACV 12-0269 DOC(RNBx)<br><br>ORDER:<br>(1) DENYING DEFENDANT MV MARKETING'S MOTION TO DISMISS FOR LACK OF SERVICE (DKT. 33)<br>(2) DENYING DEFENDANT MIKE VIETRO'S MOTION TO DISMISS FOR LACK OF SERVICE (DKT. 35)<br>(3) GRANTING PLAINTIFF'S MOTION FOR PRELIMINATION INJUNCTION (DKT. 6) |

Before the Court are three motions: (1) a Motion to Dismiss for Lack of Service filed by Defendant MV Marketing Inc. ("Defendant MV Marketing") (Dkt. 33); (2) a Motion to Dismiss for Lack of Service filed by Defendant Mike Vietro ("Defendant Vietro) (Dkt. 35); and (3) Plaintiff's Motion for Preliminary Injunction (Dkt. 6).

The Court finds the first two Motions are appropriate for decision without oral argument and DENIES them. *See* Fed R. Civ. P. 78; Local R. 7-15.

After considering all the moving papers and oral argument regarding the Motion for Preliminary Injunction, the Court GRANTS the Motion.

## I. Background

The gravamen of Plaintiff's Complaint is that Defendants MV Marketing and Vietro (collectively "Corvette Mike") have and are continuing to use Plaintiff's trademark WEST COAST CORVETTES in the domain name *WestCoastCorvette.com* and divert traffic to that website to Corvette Mike's own website. Corvette Mike does not dispute the facts stated in Plaintiff's Motion for Preliminary Injunction, and thus the Court adopts them in their entirety for the purposes of this motion. Although Corvette Mike does dispute some of the facts regarding the adequacy of Plaintiff's service of process, the Court need not resolve this fact dispute because it relies on undisputed facts or Corvette Mike's own facts to reach the holdings on Corvette Mike's Motions.

### a. West Coast continuously used the WEST COAST CORVETTES trademark since 1985 and invested several-million dollars in the Mark

Plaintiff West Coast Corvettes was founded in 1985 to offer paint and body shop services for Corvettes under the trademark WEST COAST CORVETTES (the "Mark"). (Declaration of Craig Chapman ("Chapman Decl.") at ¶ 4). In 1995, Plaintiff started selling pre-owned Corvettes and mechanical services and, in 1997, began offering parts, wheels, covers, and other Corvette accessories. *Id.* at ¶ 6.

In 1998, Plaintiff registered the domain name *WestCoastCorvette.com*—its trademark without the "s" at the end—and built a website identified by the WEST COAST CORVETTES trademark. (Chapman Decl. at ¶¶ 9, 37, Exhibits N-1 through N-17 (screen captures of West Coast's website as it appears today), Exhibits N-18 through N-28 (screen captures of West Coast's website as it appeared at various points in the past)). Since then, Plaintiff has spent several-million dollars developing and advertising the website. (Declaration of Jason Geno at ¶ 4; Chapman Decl. at ¶¶ 10, 32, Exhibit I-1 (summary of some expenses related to website development), Exhibit I-2 through I-43 (representative examples of costs incurred in developing

the website)). In the last two years there have been more than 2 million visits to the site and it has generated more than $25 million in revenue since it launched in 1998. *Id.* at ¶ 9.

Between 1997 and 2011, Plaintiff spent more than $2.6 million to advertise the Mark in media, including national Corvette-related publications. *Id.* at ¶¶ 7, 24-29, Exhibits A-1, B-1, D-1, E-1, F-1 (summaries of amounts spent), Exhibits A-2 through A-57, B-2 through B-30, D-2 through D-75, E-2 through E-67, F-2 through F-56 (representative catalogs and advertisements). Plaintiff sends a catalog to more than 60,000 customers each year, and more than 60,000 consumers subscribe to Plaintiff's e-mail list and receive frequent communications that prominently display the Mark in connection with West Coast's business. (Chapman Decl. at ¶¶ 8, 24, 33, Exhibit A-1 (amount spent on catalogs), Exhibits A-2 through A-57 (representative sample catalogs and expenses), Exhibits J-1 through J-5 (representative sample e-mails)). Plaintiff and its Mark have also earned valuable "free media"—both in terms of mainstream press and in positive mentions on specialized Internet forums dedicated to Corvette discussion. (Chapman Decl. at ¶¶ 11, 36 Exhibits M-1 through M-53 (representative samples of forum posts using the Mark to identify West Coast's business)). The Mark is particularly well-known among Corvette consumers and enthusiasts. (Chapman Decl. at ¶¶ 11-12, 36, Exhibits M-1 through M-53 (representative samples of forum posts using the Mark to identify West Coast's business); Declaration of Janet Curran at ¶¶ 3-5; Declaration of Jake Drennon at ¶¶ 3-6).

### b. Corvette Mike previously sued Plaintiff after Plaintiff began selling the same goods and services

Defendants MV Marketing and Mike Vietro (collectively "Corvette Mike") do business as "Corvette Mike." Like Plaintiff, Corvette Mike sells Corvette automobiles, parts, and accessories; and it offers Corvette repair, optimization, specialization, restoration, and modification services. (Chapman Decl. at ¶¶ 13, 39, Exhibit P-1 through P-6 (screen captures of Corvette Mike's current website)). Initially, Corvette Mike and West Coast enjoyed a mutually beneficial relationship. Corvette Mike referred customers to Plaintiff and hired it to perform body work on cars that Corvette Mike planned to resell. (Chapman Decl. at ¶ 14.) But when West Coast also began selling pre-owned Corvettes and offering mechanical services, Corvette

Mike refused to do business with West Coast. *Id.* at ¶ 15. Corvette Mike subsequently sued Plaintiff; the parties settled several years ago and temporarily resumed a business relationship. *Id.* at ¶¶ 15, 40, Exhibit Q.

### c. In 2002, Corvette Mike registered the Infringing Domain, offered to sell it to Plaintiff, and redirected visitors to the Infringing Domain to Corvette Mike's own website until Plaintiff complained

In 2002, Corvette Mike registered the domain name *WestCoastCorvettes.com* (the "Infringing Domain"). (Chapman Decl. at ¶¶ 16, 41, Exhibit R). Plaintiff's CEO, Mr. Chapman, contacted Corvette Mike's owner, Mike Vietro, and asked if there had been a mistake and to transfer control of the Infringing Domain to West Coast. (Chapman Decl. at ¶¶ 16, 42, Exhibits S-1, S-2 (copies of e-mails between Mr. Chapman and Mr. Vietro regarding the Infringing Domain)). Mr. Vietro responded by telling Mr. Chapman that there was no mistake and that if West Coast wanted its domain name that it should make an offer. *Id.* Mr. Chapman offered to pay Corvette Mike an amount greater than Corvette Mike spent to initially register the Infringing Domain. Corvette Mike refused. *Id.*

At some point, Corvette Mike configured the Infringing Domain to automatically redirect visitors to Corvette Mike's website located via the domain name *CorvetteMike.com*. *Id.* at ¶ 17. Consequently, consumers who searched for "West Coast Corvettes" were directed to Corvette Mike's competing website. Plaintiff learned of the redirection in late 2006 when a customer called Plaintiff to complain that she was unable to find her order on Plaintiff's website. *Id.* She had typed in the Infringing Domain and been redirected to Corvette Mike's site. *Id.*

Plaintiff's counsel contacted Corvette Mike regarding the matter, with a demand to cease and desist the trademark infringement and cybersquatting. *Id.* at ¶¶ 18, 43, Exhibits T-1 through T-3 (copies of the correspondence). Corvette Mike responded to Plaintiff's lawyer, claiming to have disabled the Infringing Domain. *Id.* In the same writing, Corvette Mike claimed the value of the domain name "to be in the five-figure range" and stated that he had recent conversations about selling the Infringing Domain to other potential buyers, some of which were foreign

entities. *Id*. After confirming that Corvette Mike did in fact disable the domain name, Plaintiff did not to pursue the matter further. *Id*. at ¶¶ 19-20.

### d. In 2011, Corvette Mike resumed redirecting visitors of the Infringing Domain to Corvette Mike's own website, resulting in confusion by at least one media outlet

In light of the dispute with Corvette Mike, Plaintiff decided to end its business relationship with Corvette Mike. (Chapman Decl. at ¶ 20). Plaintiff also monitored the Infringing Domain, routinely checking to see whether Corvette Mike reactivated it. *Id*. From 2007 until recently, visitors to the Infringing Domain ended up on a website called a "parking page" displaying links to other businesses and websites. (Chapman Decl. at ¶¶ 20, 38, Exhibits O-7 through O-9 (screen captures of the Infringing Domain as it appeared at various times in 2007-2011)

In 2011, Corvette Mike resumed redirecting the Infringing Domain to Corvette Mike's own competing website. (Chapman Decl. at ¶ 20). Plaintiff's counsel promptly sent another letter demanding that Corvette Mike cease and desist its trademark infringement and cybersquatting. *Id.* at ¶¶ 21, 44, Exhibits U-1 through U-2 (copies of correspondence). Corvette Mike refused to relinquish control of the Infringing Domain. *Id.*

In February of 2012, Cars On Line.com ("Cars On Line")—America's most popular classic cars website—mistakenly posted Corvette Mike's inventory in place of West Coast's inventory. (Declaration of Stephanie Oliver ("Oliver Decl.") at ¶ 4). Cars On Line traced its mistake to visiting the *WestCoastCorvettes.com* website and assuming it was related to West Coast's business. (Oliver Decl. at ¶ 5).

### e. Plaintiff sued Corvette Mike

After confirming that the Infringing Domain was continuing to redirect consumers, Plaintiff initiated the present suit. (Chapman Decl. at ¶¶ 22-23, 38, Exhibit O-1 through O-2 (screen captures of the Infringing Domain as it appeared when this action was filed; *see also* Dkt. No. 1 (Complaint)).

### f. Plaintiff attempted to serve Defendant Vietro

On March 3, Plaintiff's process server attempted to contact Mr. Vietro at his place of business and at his home in Carlsbad, California. (Declaration of Jason Sykes ("Sykes Decl.") (Dkt. 40) ¶ 3, Ex. A). During the course of four visits between March 3-5, the process serve spoke to Corvette Mike's business manager, Mike Vietro's neighbors and his wife. (Sykes Decl. ¶ 3, Ex. A). The wife and neighbors confirmed that Mr. Vietro lived at the Carlsbad address but said he was out of town on business. (Sykes Decl. ¶ 3, Ex. A). Troy Worrell, the manager at Corvette Mike also indicated Mr. Vietro was out of town. (Sykes Decl. ¶ 3, Ex. A). No one could offer a specific date when he might return or a specific location where he could currently be served. (Sykes Decl. ¶ 3, Ex. A). The process server returned to the Carlsbad residence hoping to find Mr. Vietro there or leave the papers with his wife. (Sykes Decl. ¶ 3, Ex. A). Although someone was clearly in the house, no one was willing to answer the door. (Sykes Decl. ¶ 3, Ex. A). On March 6, following a fifth service attempt, the process server left a copy of the summons and complaint, along with a copy of Plaintiff's motion for preliminary injunction and 2,800 pages of supporting documents with Troy Worrell at Mr. Vietro's usual place of business. (Sykes Decl. ¶ 3, Ex. A). A copy of the summons and complaint were mailed to Mr. Vietro at this address on that same day. (Sykes Decl. ¶ 3, Ex. A).

### g. Plaintiff attempted to serve Defendant MV Marketing

On March 5, West Coast's process server delivered a copy of the summons and complaint along with a copy of Plaintiff's motion for preliminary injunction and 2,800 pages of supporting documents to Mr. Legate's office. (Sykes Decl. ¶ 3, Exhibits A-B). The parties agree that the process server left all the documents with Jan Lawyer, an employee of Mr. Legate. *Compare* Sykes Decl. ¶ 3, Exhibit A *with* Lawyer Decl. (Dkt. 33-2). Jan Lawyer stated "ok" when she was "informed by the process server that the documents were for Corvette Mike." *See* Lawyer Decl. (Dkt. 33-2). Afterwards, Plaintiff mailed a copy of the summons and complaint to the same address where a copy of the summons and complaint were left. *Compare* Sykes Decl. Ex. B (Dkt 41-1); *compare id.* Ex. B. (Certificate of Service listing office mailing address) *with id.* Ex. A (process server stating address of office where documents were left).

## II.     Plaintiff's Service On Defendants

1    Both Defendant MV Marketing and Defendant Vietro argue that certain aspects of
2 service of process were improper.  Because the Court rejects Defendants' arguments regarding
3 these aspects or service, the Court DENIES Defendants' Motions.

### a. Defendant MV Marketing's Motion to Dismiss for Lack of Service Is Denied Because Plaintiff Satisfied Federal Rule of Civil Procedure 4(h)(1)(A)

Defendant's one-and-one-half-page brief argues that Plaintiff did not personally serve Robert J. Legate, who is Defendant MV Marketing's authorized agent for service of process, because Plaintiff only served paralegal of Mr. Legate's law firm.  Mot. (Dkt. 33).

A domestic corporation may be served in the United States by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  Fed. R. Civ. P. 4(h)(1)(A) (providing for service "in the manner prescribed by Rule 4(e)(1)"); 4(e)(1).  In this case, California provides the relevant state law.

Under California law, a corporation may be served by delivering a summons and complaint to "a person authorized by the corporation to receive service of process," commonly referred to as the agent for service.  Cal. Civ. Proc. Code § 416.10(b).  In this case, the parties agree that this agent is Mr. Legate.

While Corvette Mike is correct that Plaintiff did not personally serve Mr. Legate, Plaintiff did comply with an alternative statute providing for substitute service.  A corporation may also be served by: (1) "leaving a copy of the summons and complaint during usual office hours in [the agent for service's] office . . . with the person who is apparently in charge thereof"; and (2) "thereafter mailing a copy of the summons and complaint . . . to the [agent for service] at the place where a copy of the summons and complaint were left."[1]  Cal. Civ. Proc. Code §

---

[1] Section 415.20(a) states that: "In lieu of personal delivery of a copy of the summons and complaint to the *person* to be served as specified in Section 416.10, . . . a summons may be served by leaving a copy of the summons and complaint during usual office hours in *his or her*

415.20(a). Here, Plaintiff satisfied the first prong of Section 415.20(a) because Corvette Mike's own documents show that Plaintiff left a copy of the summons and complaint in Mr. Legate's office with his paralegal, Jan Lawyer, who stated "ok" when she was "informed by the process server that the documents were for Corvette Mike." *See* Lawyer Decl. (Dkt. 33-2). Jan Lawyer's assent to receipt of the documents showed that she was a "person who is apparently in charge" of the office. *See* Cal. Civ. Proc. Code § 415.20(a). Plaintiff satisfied the second prong by mailing a copy of the summons and complaint to the same address where a copy of the summons and complaint were left. *Compare* Sykes Decl. Ex. B (Dkt 41-1); *compare id.* Ex. B. (Certificate of Service listing office mailing address) *with id.* Ex. A (process server stating address of office where documents were left).

In sum, Plaintiff has shown that it complied with California law for service at the office of the authorized agent of a corporation and thus has shown that Plaintiff's service satisfied Federal Rule of Civil Procedure 4(h)(1)(A).

### b. Defendant Vietro's Motion to Dismiss for Lack of Service Is Denied Because Plaintiff Satisfied Federal Rule of Civil Procedure 4(e)(1)

Defendant's one-and-one-half-page brief argues that Plaintiff's substitute service was improper because Plaintiff did not use "reasonable diligence" in attempting to personally serve Defendant Vietro prior to resorting to substitute service. Mot. (Dkt. 35) at 3.

An individual may be served in the United States by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). California law provides for

---

office . . . ." Cal. Civ. Proc. Code § 415.20(a) (emphasis added). Because the "person to be served as specified in Section 416.10" precedes the possessive pronouns "his or her," the office to which the statute refers includes the office of the "person authorized by the corporation to receive service of process" under Section 416.10(b). *Compare id. with* Cal. Civ. Proc. Code § 416.10(b). In this case, that Section 416.10(b) person is Mr. Legate.

service "on a person . . . by delivering a copy of the summons and of the complaint to such person." Cal. Civ. Proc. Code § 416.90.

While Corvette Mike is correct that Plaintiff did not personally serve Defendant Vietro, Plaintiff has shown that service could not "with reasonable diligence be personally delivered to the person to be served, as specified in Section . . . 416.90." Cal. Civ. Proc. Code § 415.20(b). Here, Defendant Vietro is the person to be served under Section 416.90.

Plaintiff's reasonable diligence in attempting to serve Defendant Vietro is shown by Plaintiff's five attempts to serve Defendant Vietro at his usual place of business and his wife's current address, which is also the address where his neighbors told the process server that Defendant Vietro resides. *See Espindola v. Nunez*, 199 Cal. App. 3d 1389, 1392 (1988); (holding that "reasonable diligence" requirement of Section 415.20(b) was met where process server made three attempts to serve defendant at his and his spouse's "current address" and, in a fourth visit, left process with defendant's wife); Rutter Cal. Prac. Guide Civ. Pro. Before Trial Ch. 4-D ("Two or three attempts to personally serve defendant at a 'proper place' ordinarily qualifies as 'reasonable diligence.'").

In sum, Plaintiff has shown that it complied with California law for service at the office of the authorized agent of a corporation and thus has shown that Plaintiff's service satisfied Federal Rule of Civil Procedure 4(e)(1).

### c. Conclusion

Because the Court rejects Defendants' arguments regarding various aspects or service, the Court DENIES Defendants' Motions.

## III.  Plaintiff's Preliminary Injunction

Plaintiff seeks a preliminary injunction to stop continued use of its Mark—WEST COAST CORVETTES—in Corvette Mike's domain *WestCoastCorvettes.com*.

### a. Legal Standard for a Preliminary Injunction

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the court may grant preliminary injunctive relief in order to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b)(1)(A). The decision to grant or deny a preliminary injunction is within the

discretion of the district court. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). However, a preliminary injunctive relief is "never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).

In the Ninth Circuit, a plaintiff is entitled to a preliminary injunction if she satisfies either of two tests: (1) the *Winter* factor test; or (2) the "sliding scale" test, also referred to as the "serious questions" test.[1] *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The sliding scale test requires a slightly weaker showing of success on the merits to be outweighed by strong equitable considerations. *See id.* 632 F.3d at 1134-35.

Under the *Winter* factor test, a plaintiff is entitled to a preliminary injunction if she establishes that: (1) she is "likely to succeed on the merits"; (2) the "balance of equities tips in [plaintiff's] favor"; (3) she is "likely to suffer irreparable harm in the absence of preliminary relief"; and (4) a preliminary injunction is in the public interest. *Winter,* 555 U.S. at 20; *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005).

Under the sliding scale test, a plaintiff is entitled to a preliminary injunction if she establishes: (1) "serious questions going to the merits"; (2) "a balance of hardships that tips sharply towards the plaintiff"; (3) "a likelihood of irreparable injury"; and (2) a preliminary injunction is in the public interest. *Alliance for the Wild Rockies*, 632 F.3d 1127, 1135 (9th Cir. 2011) (noting that the last two factors are identical to two of the factors in *Winter*). While the test "requires the plaintiff to make a showing on all four prongs," the showing need not be equally strong.[2] *See id.*

---

[1] A plaintiff may also obtain a preliminary injunction without satisfying either of these two tests if a statute provides for a lesser showing. *See e.g., Tennessee Valley Authority v. Hill*, 437 US 153, 194 (1978); *United States v. Estate Pres. Services*, 202 F.3d 1093, 1098 (9th Cir. 2000) ("The traditional requirements for equitable relief need not be satisfied since Section 7408 expressly authorizes the issuance of an injunction.").

[2] In *Alliance for the Wild Rockies*, the Ninth Circuit followed the overwhelming majority of Circuits to hold that the sliding scale test survived the Supreme Court's decision in *Winter,*. *See*

### b. Plaintiff is entitled to a preliminary injunction

Under either the *Winter* or sliding scale test, Plaintiff is entitled to a preliminary injunction to stop Corvette Mike's use of Plaintiff's Mark in the Infringing Domain to direct traffic to Corvette Mike's website. The Court first addresses Corvette Mike's two bases for

---

*Alliance for the Wild Rockies*, 632 F.3d 1127, 1135 (9th Cir. 2011) (reversing denial of preliminary injunction because district court's failure to apply the "serious questions" test was "an error of law"); *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.) ("[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (emphasis in original); *but cf. Real Truth About Obama, Inc., v. Fed. Election Comm'n*, 575 F.3d 343, 347 (4th Cir. 2009) (holding that the "sliding scale approach" does not survive the *Winter* decision) *vacated on other grounds by* 130 S.Ct. 2371 (2010). The Ninth Circuit's holding that the sliding scale test survives *Winter* is also consistent with scholars' conclusions and the Supreme Court's own statements. *See Winter*, 555 U.S. at 51 (Ginsburg, J., dissenting) ("This Court has never rejected [the sliding scale] formulation, and I do not believe it does so today."); Bethany M. Bates, <u>Reconciliation After Winter: The Standard for Preliminary Injunctions in Federal Courts</u>, 111 Colum. L. Rev. 1522, 1523, 1552-53 (2011) (explaining that the sliding scale analysis survives *Winter* because "contemporary Supreme Court cases also support the use of the sliding scale approach" and *Winter* merely held that "only showing a 'possibility' of irreparable harm was not enough" to obtain a preliminary injunction, but "failed to comment on whether courts could use a sliding scale analysis or whether a movant could be granted a preliminary injunction based on a showing that there are serious questions going to the merits").

opposition – lack of jurisdiction and violation of the local rules – and then turns to the four factors a court must weigh in determining whether to grant a preliminary injunction.

### i. Corvette Mike's Opposition lacks merit because this Court has jurisdiction and provided Corvette Mike with additional time to respond

In its three-page Opposition, Corvette Mike argues that: (1) this Court lacks jurisdiction over Defendant MV Marketing due to lack of service; (2) Plaintiff served its Motion only 27 days in advance of the hearing, not the 28 days required by Local Rule 6-1; and (3) Plaintiff should be required to post a bond.

The Court rejects the first argument because Plaintiff's service was proper, as the Court explained in Section II of this order.

The Court rejects the second argument because, even if Corvette Mike's interpretation of Local Rule 6-1 is correct, the Court provided Corvette Mike with an additional five days to file an Opposition when it rescheduled the hearing on this Motion from April 2 to April 23, 2012. *See* March 28, 2012, Order (Dkt. 38).

Finally, the Court rejects Corvette Mike's third argument because Corvette Mike cites no authority to support it.

### ii. Plaintiff is likely to succeed on the merits

Plaintiff satisfies both the *Winter* and sliding scale test because Plaintiff has shown that it is likely to succeed on the merits. *See Winter,* 555 U.S. at 20 ("likely to succeed on the merits"); *Alliance for the Wild Rockies*, 632 F.3d at 1135 ("serious questions going to the merits"). Plaintiff is likely to succeed on the merits of its claim that Corvette Mike's redirection of the Infringing Domain is cybersquatting under the Anticybersquatting Consumer Protection Act ("ACPA"),[3] 15 U.S.C. § 1125(d). (Compl. (Dkt. 1) at ¶ 47).[4]

---

[3] 15 U.S.C. § 1125(d) is also referred to as the Anticybersquatting Consumer Protection Act. *See Orange County Found. for Med. Care v. Eakins*, 2007 U.S. Dist. LEXIS 83166 at * 8 (C.D. Cal. Sept. 24, 2007).

-12-

One of the ways in which a defendant may be liable under the ACPA is if: (1) the defendant "registers, traffics in, or uses a domain name"; (2) the plaintiff is the owner of a "mark that is distinctive at the time of registration of the domain name"; (3) the domain name is "identical or confusingly similar to" the plaintiff's mark; and (4) the defendant "has a bad faith intent to profit from that mark." *See* 15 U.S.C. § 1125(d) (1)(A); *Orange County Found. for Med. Care v. Eakins*, 2007 U.S. Dist. LEXIS 83166 at *8 (C.D. Cal. Sept. 24, 2007).

### 1. Corvette Mike registered and used the Infringing Domain

Plaintiff will likely be able to show that Corvette Mike registered and used the Infringing Domain. In 2002, Corvette Mike registered the domain name *WestCoastCorvettes.com*. In 2011, Corvette Mike resumed redirecting the Infringing Domain to Corvette Mike's own competing website.

### 2. Plaintiff's mark was likely suggestive and thus distinctive at the time Corvette Mike used the Infringing Domain

Plaintiff will likely be able to show that at the time Corvette Mike registered the Infringing Domain in 2002 or used it in 2011, Plaintiff's Mark was likely suggestive and thus "distinctive." *See* 15 U.S.C. § 1125(d) (1)(A).

Distinctiveness for purposes of an APCA claim in the same as in general trademark law. *See Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1197 (9th Cir. 2009). A mark is "inherently distinctive" if it is "suggestive." *Id.* A mark is suggestive if "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *See Lahoti*, 586 F.3d at 1198.

---

[4] Because the Court concludes the Plaintiff is likely to succeed on its ACPA claim, the Court does not address the other two claims Plaintiff brings: (1) trademark infringement and false designation of origin under the federal Lanham Act, 15 U.S.C. § 1125(a); and (2) unfair competition under California common law and Business & Professions Code § 17200. (Compl. (Dkt. 1) at ¶¶ 58, 69).

-13-

Here, Plaintiff will likely be able to show that a mental leap is required to make the connection between Plaintiff's Mark, WEST COAST CORVETTES, and many of the products Plaintiff offers in connection with it—such as clocks, mugs, chairs and stools. (*See* Chapman Decl. at ¶¶ 6, 37, Exhibits N-2 through N-4).  Furthermore, Corvette Mike's decision to register the exact Mark itself as a domain name and redirect visitors to its own website is strong evidence of the Mark's distinctiveness. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 2001) ("[P]roof of copying strongly supports an inference of secondary meaning."). Finally, it is appropriate for a court to grant a preliminary injunction if a plaintiff has even a "fair chance" of proving secondary meaning. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984).

At oral argument, Corvette Mike implied that Plaintiff's mark was generic because it was a composite mark comprised of two terms, neither which are capable of being trademarked by Plaintiff: (1) "WEST COAST," which is a generic geographic description of Plaintiff's location; and (2) "CORVETTES," which is a trademark owned by a company other than Plaintiff. However, as Defendant conceded, "validity of a trademark is to be determined by viewing the trademark as a whole." *California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985).  Thus, even where a mark is a "composite" of generic or non-trademarkable terms, the mark's "validity is not judged by an examination of its parts." *Id.*  (upholding preliminary injunction on plaintiff's claim that its mark, "California Cooler," was infringed by defendant's mark, "California Special Cooler," because plaintiff's mark was at least descriptive given that generic term for parties' products was "wine cooler" and "[w]ords which could not individually become a trademark may become one when taken together"); *see also* 2 McCarthy on Trademarks and Unfair Competition § 12:39 (4th ed.) ("[G]enericness of a composite is determined by examining the composite as a whole rather than examining its constituent parts individually.").  Given that Corvette Mike included no authority in its opposition regarding the strength of Plaintiff's mark, Corvette Mike's oral argument does not persuade this Court that Plaintiff is unlikely to show that the mark is protected.

In addition, Corvette Mike expressed concern in both the briefing and at oral argument that the Court's conclusions in this preliminary injunction order regarding the strength of Plaintiff's mark could somehow prevent Defendant from litigating the strength of Plaintiff's mark later in this case. Corvette Mike's concerns are unfounded. The Court's conclusions in this order regarding Plaintiff's *likelihood* of success on there merits are obviously not final judgments on the merits.

### 3. The Infringing Domain is at least confusingly similar to Plaintiff's mark

Plaintiff will likely be able to show that the Infringing Domain, *WestCoastCorvettes.com.*, is at least confusingly similar to Plaintiff's Mark, WEST COAST CORVETTES. Such confusion will be shown by the actual confusion suffered by Cars On Line when it mistakenly posted Corvette Mike's inventory in place of West Coast's inventory by visiting the Infringing Domain. In addition, confusion is likely because Plaintiff's Mark and the Infringing Domain differ only because the latter contains a ".com" at the end, a suffix which is necessary to direct visitors to the website. *See Partners for Health & Home, L.P. v. Yang*, 2011 U.S. Dist. LEXIS 130921, at *17-18 (C.D. Cal. Oct. 28, 2011) ("[C]opying another party's trademark exactly within a domain name 'creates a presumption of likelihood of confusion among Internet users as a matter of law.'").

### 4. Defendant had a bad faith intent to profit from that marks

To assist courts in determining bad faith, the cybersquatting statute provides a non-exclusive list of nine factors to consider. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(I-IX). In this case, the majority of factors indicate bad faith and the remainder do not apply:

The first factor supports a finding of bad faith because Corvette Mike does not appear to have "trademark or other intellectual property rights . . . in the domain name." *See id.* at 1125(d)(1)(B)(i)(I).

The second factor supports a finding of bad faith because Plaintiff's Mark does not "consist of the legal name of" Corvette Mike, nor is Plaintiff's Mark "a name that is otherwise commonly used to identify that person." *Id.* at 1125(d)(1)(B)(i)(II).

Both the third and fourth factors support a finding of bad faith because Corvette Mike's "prior use" of the Infringing Domain has not been "in connection with the bona fide offering of any goods or services," *id.* at 1125(d)(1)(B)(i)(III), nor has Corvette Mike engaged in "bona fide noncommercial or fair use of the mark," *id.* at 1125(d)(1)(B)(i)(IV). Instead, Corvette Mike uses the Infringing Domain to siphon consumers away from Plaintiff. *See Brookfield Commc'ns., Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999) (misdirecting Internet traffic by using another party's mark is unlawful).

The fifth factor supports a finding of bad faith because Corvette Mike's redirecting of visitors to the Infringing Domain to Corvette Mike's domain demonstrates Corvette Mike's "intent to divert consumers from the [Plaintiff's] online location to a site accessible under the [Infringing Domain] that could harm the goodwill represented by [Plaintiff's] mark, either for commercial gain or with the intent to tarnish or disparage [Plaintiff's] mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." *Id.* at 1125(d)(1)(B)(i)(V). Corvette Mike's use of the Infringing Domain Name has been to divert customers from West Coast to the competing Corvette Mike business. Unwitting customers and even a sophisticated trade publication, Cars On Line, were duped into thinking that Corvette Mike was affiliated with Plaintiff.

The sixth factor—offering to "sell . . . the domain name to the mark owner or any third party for financial gain"—also supports a finding of bad faith. *Id.* at 1125(d)(1)(B)(i)(VI). This Court issued a temporary restraining order in a different case based on this factor, and other courts have recognized that offering to sell the name is enough to find bad faith. *See Orange County Foundation for Medical Care v. Eakins*, 2007 U.S. Dist. LEXIS 83166 at * 2(C.D. Cal. Sept. 24, 2007). In *Lahoti*, for example, the Ninth Circuit affirmed summary judgment on bad faith based upon the defendant's offer to sell the domain name to the mark owner for a five-figure sum. *Lahoti*, 586 F.3d at 1203. Corvette Mike offered to sell the Infringing Domain to West Coast or a third party for a five-figure sum.

The ninth factor—whether Plaintiff's Mark is "distinctive"—also supports a finding of bad faith. *Id.* at 1125(d)(1)(B)(i)(IX). As discussed in the previous subsection, Plaintiff is likely to show distinctiveness.

### 5. Conclusion

In sum, Plaintiff is likely to succeed on the merits of its APCA claim.

### iii. The balance of the equities tip sharply in Plaintiff's favor

Plaintiff satisfies both the *Winter* and sliding scale test because Plaintiff has shown that the equities tip sharply in its favor. *See Winter,* 555 U.S. at 20 ("balance of equities tips in [plaintiff's] favor"); *Alliance for the Wild Rockies*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("a balance of hardships that tips sharply towards the plaintiff"). Corvette Mike registered a domain name that is at least confusingly similar to Plaintiff's Mark and threatened to sell the name to unknown, possibly foreign, third parties. Corvette Mike does not have a right to profit from creating confusion among consumers. *See Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . ." (citation omitted)), *superseded in part by statute on other grounds*, 17 U.S.C. § 117(c), *as recognized in Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1158 (9th Cir. 2011).

Corvette Mike has no intellectual property interest in the Infringing Domain. The Infringing Domain contains no independent content, but rather just misdirects consumers.

Furthermore, Corvette Mike voluntarily stopped using the Infringing Domain for a period of years. Thus, Defendants will suffer no actual harm if the injunction issues.

### iv. Plaintiff is likely to suffer irreparable harm

Plaintiff satisfies both the *Winter* and sliding scale test because Plaintiff has shown that it will likely suffer "irreparable harm in the absence of preliminary relief." *Winter,* 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d 1127, 1135 (9th Cir. 2011).

"[I]rreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim." *Brookfield Communications, Inc. v. W. Coast Entm't*

*Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999); *see also Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 (9th Cir. 1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.").

But even without this presumption, Corvette Mike is causing Plaintiff irreparable harm by redirecting Plaintiff's customers to a direct competitor's website. Consumers mistakenly accessing Corvette Mike's confusingly similar website causes Plaintiff unknown and substantial harm that money cannot remedy. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1327 (9th Cir. 1998) (citations omitted) ("[p]rospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page . . .").

Finally, Corvette Mike's threat to sell the Infringing Domain to a third party also supports an irreparable-harm finding. *Super-Krete Int'l, Inc.*, 712 F. Supp. 2d at 1037 ("[T]he threat of an ongoing loss of prospective customers if Plaintiff should be prevented from gaining control of the [Infringing Domain] supports a finding of irreparable harm."). This is especially so given that the third party may be a foreign entity that will be beyond the effective reach of U.S. courts.

### v. A preliminary injunction is in the public interest

Plaintiff satisfies both the *Winter* and sliding scale test because Plaintiff has shown a preliminary injunction is in the public interest. *Winter,* 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d 1127, 1135 (9th Cir. 2011). Corvette Mike is misleading the consuming public by diverting customers from West Coast to the Corvette Mike website. By granting an injunction, this Court would not only provide relief to West Coast but also relieve the public of confusion. The public interest favors a preliminary injunction.

### vi. Courts, including this one, have issued injunctive relief in similar circumstances

In sum, Plaintiff is entitled to a preliminary injunction under either the *Winter* or the sliding scale test. Given similar facts, other courts have granted injunctive relief. *See e.g.*, *In*

*Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1031 (C.D. Cal. 2010) (granted an injunction to protect the plaintiff's SUPER-CRETE mark where defendant registered the domain SuperCrete.com).

Indeed, in a case very similar to this one, this Court granted a temporary restraining order where the defendant registered a domain name identical to the name by which "the industry has come to know and refer to Plaintiff." *See Orange County Foundation for Medical Care v. Eakins*, 2007 U.S. Dist. LEXIS 83166 at * 2(C.D. Cal. Sept. 24, 2007). The plaintiff requested that the defendant transfer the name. But the defendant responded the same as Corvette Mike did in this case—by demanding that the plaintiff buy the domain name. The domain name in *Eakins* was always pointed at the plaintiff's authentic website, so there was no confusion in the marketplace. Nonetheless, this Court granted a temporary restraining order, noting that an offer to sell a domain name identical to a trademark is often synonymous with a bad faith intent to profit.

This case is similar to *Eakins* because Corvette Mike registered a domain name that the Corvette industry has come to know and refer to as West Coast. Like the plaintiff in *Eakins*, West Coast asked Corvette Mike to transfer the name but Defendants refused absent a significant monetary payment. But Corvette Mike's bad faith is more egregious than the defendant in *Eakins*. Here, Corvette Mike is trading off the goodwill in the Mark by redirecting the Infringing Domain to the Corvette Mike website, whereas in *Eakins* the plaintiff enjoyed use of the domain name. Since the harm to West Coast is much greater than in *Eakins*, this case is even more deserving of an injunction against Corvette Mike.

///

///

## IV. Disposition

For the foregoing reasons, the Court:

(1) DENIES Defendant MV Marketing' Motion to Dismiss for Lack of Service (Dkt. 33);

(2) DENIES Defendant Vietro's Motion to Dismiss for Lack of Service filed (Dkt. 35);

(3) GRANTS Plaintiff's Motion for Preliminary Injunction (Dkt. 6).

DATED: April 23, 2012

_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE